ELIZABETH STACKIEWICZ, Appellant and Cross-Respondent, v. NISSAN MOTOR CORPORATION IN U.S.A., a California Corporation, Respondent and Cross-Appellant and CARSON CITY INVESTORS, a Nevada Corporation, dba CARSON CITY DATSUN AMC JEEP, Respondent.

No. 14084

August 7, 1984 686 P.2d 925

[Rehearing denied October 4, 1984]

*Smith & Gamble, Ltd.,* and *David R. Gamble,* Carson City; *Leonard Sacks, Esq.,* Northridge, California for Appellant and Cross-Respondent.

*Lionel, Sawyer & Collins,* and *Steve Morris* and *David Frederick,* Las Vegas; *Eugene J. Wait,* Reno for Respondent and Cross-Appellant Nissan Motor Corporation in U.S.A.

*Cromer, Barker, Michaelson, Gillock & Rawlings,* Reno, for Respondent Carson City Investors.

*Kent R. Robison,* Reno, for Nevada Trial Lawyers' Association, and *Robert E. Cartwright,* San Francisco, California, for Association of Trial Lawyers of America, Amicus Curiae.

## OPINION

By the Court, MOWBRAY, J.:

Appellant Elizabeth Stackiewicz brought this action to recover damages for injuries she sustained while driving a Datsun B210 automobile, distributed and sold by respondents Nissan Motor Corporation in U.S.A. and Carson City Investors.

At the conclusion of Elizabeth's case in chief, the District Judge granted the motion of the dealer, Carson City Investors, to dismiss all causes of action against the dealer. The court further granted respondent Nissan's motion to dismiss Elizabeth's causes of action against Nissan predicated on negligence and misrepresentation, and reserved ruling on the strict liability cause of action until the end of the trial. Nissan then presented its defense. At the conclusion of the case the jury found in favor of Elizabeth and awarded her $3,775,000 in damages.

Nissan filed motions for judgment notwithstanding the verdict and for a new trial. The trial court granted Nissan's motion for a judgment n.o.v., and further ruled that in the event the judgment notwithstanding the verdict was reversed on appeal, a new trial would be ordered unless Elizabeth accepted a remittitur reducing the verdict by $1,559,013.

The plaintiff appealed the order of judgment n.o.v., the dismissal of the dealer, and the order of remittitur. The defendants, on cross-appeal, argue that they were entitled to an unconditional order for a new trial on the basis of juror misconduct.

### THE FACTS

The Datsun was purchased new from the dealer, Carson City Investors and was operated normally in Carson City and the surrounding area. Nothing unusual was observed in the operation of the vehicle from the date of purchase to the date of the

accident about two months later. At the time of the accident the vehicle had been driven approximately 2,400 miles.

The vehicle was given a 1,000 mile service check by the respondent dealer prior to the accident and no significant complaints were made to the dealer concerning its mechanical operation. The only unusual matter that Elizabeth noted concerning the Datsun was a clicking in the steering column.

On the day of the accident, Elizabeth, her mother, Veronica Wright, and Kimberly Seames, a friend, departed Carson City in the Datsun for Reno. Elizabeth was driving. Mrs. Wright was in the passenger seat, and Kimberly Seames was seated in the middle of the rear seat. They were proceeding north on Highway 395, a limited access divided highway. The weather was clear and dry. There was no significant wind.

Highway 395 northbound had two 12-foot lanes, a 3-foot shoulder on the west and a 10-foot shoulder on the east in the area of the accident. There was a 60-foot median west of the highway which divided the northbound and southbound lanes.

Elizabeth was in the right-hand lane, behind another vehicle, when she proceeded to pass that car on the left. She was traveling at 50-55 miles per hour. After Elizabeth passed the car, her own vehicle kept turning to the left. She attempted to turn the car back to the right. The steering wheel locked and would not turn. The testimony was that all four wheels of the car were still on the pavement at that time. Elizabeth's mother told her to turn the car back on the road. Elizabeth told her mother she could not turn the car and Mrs. Wright reached over to help her. The steering wheel would not turn. The car then hit a highway marker and rolled over and down the median, ending in an upright position.

Immediately after the accident the occupants of the car told persons at the scene that something had gone wrong with the steering. The investigating police officer, Nevada Highway Patrolman Conely, testified that when he first talked with Mrs. Wright, Kimberly Seames and Elizabeth at the hospital on the day of the accident, they all stated that the steering wheel would not respond and that this malfunction occurred before the vehicle left the highway.

Elizabeth's counsel retained various experts who were unable to find a defect in the steering mechanism. Professor Lindley Manning, an expert called by Elizabeth, testified that defects are difficult to locate but that the existence of a defect should not be eliminated because it had not been found. Professor Manning testified that the brakes on the vehicle were applied at a point which would place the vehicle entirely on the road at the time of their application. It was his opinion that the locking of the steering wheel caused the vehicle to go off the road.

## THE JUDGMENT NOTWITHSTANDING THE VERDICT

This Court held in Dudley v. Prima, 84 Nev. 549, 445 P.2d 31 (1968), "the power to grant such motions [for j.n.o.v.] should be cautiously exercised." *Id.* at 551, 445 P.2d at 32.

> 'In determining whether to render a judgment non obstante veredicto, the court is not justified in trespassing on the province of the jury to be the judge of all questions of fact in the case, and the party favored by the verdict is entitled to have the testimony read in the light most advantageous to him, and to be given the benefit of every inference of fact fairly deducible therefrom. Accordingly, an application for such judgment will be refused where there is evidence tending to support the verdict, or where there is a conflict of evidence, so that the jury could properly decide, either way. . . .'

*Id.* at 551, 445 P.2d at 32, *quoting* Ries v. Sanders, 34 F.R.D. 468, 470 (N.D.Miss. 1964). *See also* Jacobson v. Manfredi, 100 Nev. 226, 679 P.2d 251 (1984); Cleveland v. Bally Distributing Co., 96 Nev. 552, 612 P.2d 684 (1980).

Applying this standard in the case at bar we find that the trial court erred in granting the judgment n.o.v. Nissan's principal argument, which the trial court accepted in granting the j.n.o.v., was that the plaintiff failed to introduce sufficient evidence to show that the accident was caused by a defect existing when the product was marketed, which defect would support a finding that the product was subject to strict tort liability. Nissan contends that the plaintiff was required to produce direct evidence of a specific product defect, and was further required to negate any alternative causes of the accident. We do not agree that such a restriction may be placed, as a matter of law, upon the form of proof that is required to establish a defective product.

In 1966 this Court adopted the doctrine of strict tort liability against the manufacturer and distributor of a bottled beverage. Shoshone Coca-Cola v. Dolinski, 82 Nev. 439, 420 P.2d 855 (1966). We set forth the rationale for this rule as follows:

> [P]ublic policy demands that one who places upon the market a bottled beverage in a condition dangerous for use must be held strictly liable to the ultimate user for injuries resulting from such use, although the seller has exercised all reasonable care, and the user has not entered into a contractual relation with him. Perhaps the supporting policy reasons are best expressed by William L. Prosser in his

article, "The Fall of the Citadel," 50 Minn. L. Rev. 791, 799 (1966): "The public interest in human safety requires the maximum possible protection for the user of the product and those best able to afford it are the suppliers of the chattel. By placing their goods upon the market, the suppliers represent to the public that they are suitable and safe for use; and by packaging, advertising and otherwise, they do everything they can to induce that belief. . . ."

*Id.* at 441-442, 420 P.2d at 857. We further quoted with approval Justice Traynor's observation that "Even if there is no negligence . . . public policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market." Escola v. Coca-Cola Bottling Co. of Fresno, 150 P.2d 436, 440 (Cal. 1944) (concurring). Rather than proof of negligence, or privity, we held that the plaintiff's case in strict liability would simply consist of proof "that his injury was caused by a defect in the product, and that such defect existed when the product left the hands of the defendant." 82 Nev. at 443, 420 P.2d at 858.

In Ginnis v. Mapes Hotel Corporation, 86 Nev. 408, 470 P.2d 135 (1970), we extended our ruling in *Shoshone* to the designers and manufacturers of all types of products. We further determined that a plaintiff established a sufficient case for the jury that a product was defective by showing that "it failed to perform in the manner reasonably to be expected in light of its nature and intended function and was more dangerous than would be contemplated by the ordinary user having the ordinary knowledge available in the community." *Id.* at 413, 470 P.2d at 138. Such a condition is, in the words of the Restatement (Second) of Torts, Section 402A(1) (1965), "unreasonably dangerous." *See also* Ward v. Ford Motor Co., 99 Nev. 47, 657 P.2d 95 (1983).

Thus we have held that proof of an unexpected, dangerous malfunction may suffice to establish a prima facie case for the plaintiff of the existence of a product defect. The origins of this approach in the implied warranty branch of the antecedents of strict liability is illustrated in the following language found in Lindsay v. McDonnell Douglas Aircraft Corporation, 460 F.2d 631, 639 (8th Cir. 1972), which adopted the doctrine of strict liability in tort in federal maritime law:

"Proof of the specific defect in construction or design causing a mechanical malfunction is not an essential element in establishing breach of warranty. 'When machinery "malfunctions," it obviously lacks fitness regardless

of the cause of the malfunction. Under the theory of warranty, the "sin" is the lack of fitness as evidenced by the malfunction itself rather than some specific dereliction by the manufacturer in constructing or designing the machinery.' Greco v. Bucciconi Engineering Co., [283 F.Supp. 978, 982 (W.D.Pa. 1967), *aff'd,* 407 F.2d 87 (3d Cir. 1969)]."

*Quoting* MacDougall v. Ford Motor Company, 257 A.2d 676, 679 (Pa.Super. 1969).

It has been held that " 'a specific defect in the product is not an essential element in establishing a cause of action,' " since " 'in the field of products liability the focus is on the product and not necessarily on its component parts.' " Kileen v. General Motors Corp., 421 A.2d 874, 875 (Conn.Super. 1980). When there is evidence of some dangerous condition, the "factfinder can find, where other identifiable causes are absent, that the mere evidence of a malfunction is sufficient evidence of a defect." *Id.* at 876.

In Tweedy v. Wright Ford Sales, Inc., 357 N.E.2d 449 (Ill. 1976), which the district judge cited but declined to follow in the instant case, the defendant manufacturer alleged that the plaintiff had not made a sufficient case for the jury, when the plaintiff had offered evidence of a brake malfunction at the time of the accident. The automobile in question was approximately six months old and had been driven approximately 7,500 miles without any brake problems. Plaintiff's daughter testified that she had experienced a temporary brake failure. Plaintiff testified that the brakes went out completely several hours later on the same day while the car was being driven carefully at a reasonable rate of speed, on dry roads and in good weather. Plaintiff did not offer any expert testimony concerning the presence of a specific defect, while defendant's expert testified that there was no defect. The Illinois Supreme Court affirmed judgment for plaintiff, holding that both a defect and its existence when it left the manufacturer were established by proof that the product failed to perform in the manner reasonably to be expected in light of its nature and intended function, in the absence of abnormal use or reasonable secondary causes. The failure of the brakes to function in the manner reasonably to be expected, in itself and without more, established the defect.

In the leading and oft-cited case of Greco v. Bucciconi Engineering Co., *supra,* 407 F.2d 87 (3d Cir. 1969), *affirming* 283 F.Supp. 978 (W.D.Pa. 1967), the plaintiff was injured when a magnetic steel piler malfunctioned while being used as it was

intended to be used. The defendants, the manufacturer and seller of the piler, contended that plaintiff failed to sustain his burden of showing the existence of a defect at the time of sale. The only evidence of a defect was that the machine malfunctioned, and was a relatively new machine, having been in operation about six months prior to the accident.

The Court of Appeals, applying Pennsylvania law, held that a defective condition is established, "within the meaning of [Restatement (Second) of Torts] Section 402A by proving that the product functioned improperly in the absence of abnormal use and reasonable secondary causes," 407 F.2d at 89-90. Although defendants contended that an electrical problem in the control panel, which defendants neither manufactured nor supplied, caused the malfunction, the Court of Appeals held that the jury could nevertheless properly have inferred that the malfunction was caused by a defect in defendants' product. *Id.* at 91 n. 7.

Other courts have had occasion to apply these principles to the malfunctioning of the steering or control mechanism of a car. In Vanek v. Kirby, 450 P.2d 778, *rehearing denied,* 454 P.2d 647 (Or. 1969), plaintiff was unable to allege a specific defect in his pleading, but alleged that while riding as a passenger in a new Ford automobile he became injured when the vehicle became "uncontrollable in normal operation" and left the highway. *Id.* at 780. The court held that proof of these allegations would support a recovery and therefore the complaint stated a cause of action.

Dennis v. Ford Motor Co., 332 F.Supp. 901 (W.D.Pa. 1971), *aff'd,* 471 F.2d 733 (3d Cir. 1973), also involved evidence similar to that at bar in that plaintiff's employee was driving a new (2-day old) tractor-trailer combination which left the highway, causing loss of the property. The driver testified that he felt the right front wheel give way and he then lost steering control. Construing the law under Restatement (Second) of Torts, Section 402A, the District Court said that the evidence was sufficient to establish that the accident was caused by a malfunction of the steering mechanism. 332 F.Supp. at 903. The court held that "evidence of a malfunction of a vehicle is sufficient to establish liability without proof of the specific defect causing the malfunction." *Id.*

On the facts presented in this case, we conclude that evidence of a steering malfunction which resulted in the driver losing control of the vehicle might properly be accepted by the trier of

fact as sufficient circumstantial proof of a defect, or an unreasonably dangerous condition, without direct proof of the mechanical cause of the malfunction.[1]

In this case, Elizabeth testified that the four tires were on the pavement when the steering wheel froze. She further testified that the four tires were on the pavement when her mother tried to turn the steering wheel back to the right. Finally, Elizabeth testified that the steering wheel would not turn to the right.

Veronica Wright testified that when she noticed the car was veering gradually to the left, the four tires were on the pavement. She heard no gravel striking the underside of the car. When asked to describe how the steering wheel felt, Mrs. Wright said:

> Like it does in my car when the steering is locked. There was just no give at all. If I could grab the steering wheel and go like that (indicating), I was trying to get the car to come back to the right. There was no response whatsoever.

The passenger, Kimberly Seames, also testified regarding the sequence of events. She recalled first hearing Elizabeth's voice, in frightened tones, saying something to the effect of, "Mom, the steering won't work." She also testified that the four tires were on the pavement when Elizabeth and her mother were trying to steer the car back to the right. When asked if she had formed any opinion as to the cause of the car's movement to the left, she replied:

> Not in any definite opinion. I felt like the steering locked, and they weren't able to move it to the right and so the car kept going off the road.

Professor Manning testified that it was his opinion that the brakes were applied when the vehicle was on the road and that the locking of the steering wheel caused the Datsun to go off the pavement.

---

[1] Other cases holding to similar effect include: Knight v. Otis Elevator Company, 596 F.2d 84 (3d Cir. 1979) (Pa. law); Stewart v. Ford Motor Co., 553 F.2d 130 (D.C. Cir. 1977); Price v. Admiral Corp., 527 F.2d 412 (5th Cir. 1976) (Miss. law); Franks v. National Dairy Products Corporation, 414 F.2d 682 (5th Cir. 1969) (Tex. law); Stewart v. Budget Rent-A-Car Corporation, 470 P.2d 240 (Haw. 1970); Farmer v. International Harvester Company, 553 P.2d 1306 (Id. 1976); Brownell v. White Motor Corp., 490 P.2d 184 (Or. 1971). *See also* P. Rheingold, "Proof of Defect in Product Liability Cases," 38 Tenn. L. Rev. 325, 329 (1971); Comment, "Products Liability and the Problem of Proof," 21 Stan. L. Rev. 1777 (1969); 2 L. Frumer & M. Friedman, Products Liability, Sections 16A[4][e][ii], and 16A[4][f][i] at 3B-120.3 (1984 ed.).

We agree with the Supreme Court of Oregon that when the plaintiff has presented circumstantial evidence that a defect caused the accident in question, the credibility of such evidence is an issue to be left to the jury. "If the jury believes plaintiffs' evidence, the defendants, as is true in any case when the jury initially believes the plaintiffs' evidence, must come forward and convince the jury that the plaintiffs' evidence is incorrect, or the inferences to be drawn from plaintiffs' evidence do not lead to the conclusion that a defect in the vehicle was the cause of the damage." Brownell v. White Motor Corporation, *supra,* 490 P.2d at 186. Defendants are not entitled to short-circuit the normal adversary process by convincing the court, rather than the jury, of the virtue of their position.

In commenting upon the trial court's proper role in considering a 41(b) motion, this Court has held:

> There may well be merit to defendant's theory of the case, but the function of the trial judge is not to determine the respective merits. . . . It is not for him to weigh or compare or balance the inferences in favor of the one party and against the other. Conflicting inferences from known facts are for jury determination.

Roche v. Schartz, 82 Nev. 409, 412-13, 419 P.2d 779, 781 (1966).

Applying these principles to the evidence presented in the case at bar, we conclude that the jury's verdict was permissible, and that the district judge erred when he overturned the jury's verdict.

## THE NEW TRIAL/JUROR MISCONDUCT

Nissan argues in its cross-appeal that the district court abused its discretion in failing to issue an unconditional order for a new trial, on the basis of alleged juror misconduct, including an allegation that a juror made independent inquiry regarding a possible cause of the accident. As to particular instances of overt conduct by certain jurors, the district court found that even if those acts constituted misconduct, no prejudice resulted to Nissan. The question of prejudice is "ultimately a question of fact. 'It is for the trial court to determine in the first instance . . . and its judgment thereon will not be overturned unless abuse of discretion is manifest.' " Barker v. State, 95 Nev. 309, 313, 594 P.2d 719, 721-722 (1979). The record supports the trial court's determination, and we accordingly do not find an abuse of discretion.

Nissan also submitted affidavits by several jurors stating that during their deliberations the effect of income taxes upon the award was mentioned. Mere mention of such factors is not misconduct. *See* Cornejo v. Probst, 630 P.2d 1202 (Kan.App. 1981); *cf.* Holden v. Porter, 405 F.2d 878 (10th Cir. 1969) (mention of insurance coverage not misconduct). The district judge did not err in denying the motion for a new trial predicated upon alleged juror misconduct.

## DAMAGES

In his order of remittitur the district judge found Elizabeth's medical and special damages to be $656,973. This amount was not remitted. The balance of the verdict, $3,118,027, represented the jury's award to Elizabeth for past and future physical and mental pain and suffering. The district judge reduced this part of the verdict by half, $1,559,013, reaching a new verdict of $2,215,986.

After the accident, Elizabeth was treated by Cameron Lindberg, an orthopedic surgeon. Dr. Lindberg testified that when Elizabeth was brought to the hospital by ambulance on the day of the accident, she had no movement in her lower extremities and was suffering from severe back and shoulder pain. X-rays revealed that Elizabeth's ninth thoracic vertebra was crushed, that her tenth thoracic vertebra was also fractured and that her spinal cord was severed. In addition, Elizabeth suffered a fractured clavicle.

Dr. Lindberg testified that as a result of her injuries, Elizabeth was rendered a "paraplegic at the level of T9," meaning she had no muscle or sensory function of any significant degree below the waist. She cannot function without a wheelchair. Dr. Lindberg further testified that, because of her disability, Elizabeth is likely to be employed only under very special circumstances, and that it is not a realistic expectation that she will enter the usual work force. Before her injury, plaintiff intended to become a psychologist.

Dr. Walter J. Treanor, who specializes in rehabilitation, also treated Elizabeth. Dr. Treanor testified that, as a result of her injuries, Elizabeth is a paraplegic, that she has lost the use of her legs. He also testified that Elizabeth would be able to perform sedentary employment, but will have problems with access.

Dr. Treanor also testified that Elizabeth will incur future medical expenses. These future medical expenses were considered by Dennis Goslin, a professor of mathematics, in determining the extent of plaintiff's economic loss. According to

Mr. Goslin, Elizabeth's life expectancy as of the time of the trial was 57.2 years. Using this life expectancy, Goslin testified that the present value of Elizabeth's future medical expenses is $136,410. When this amount is added to the loss attributable to Elizabeth's restricted employment opportunities, the present value of Elizabeth's total economic losses ranges from approximately $325,000 to $640,000. In addition, Elizabeth had incurred medical expenses of $79,623 from the date of the accident to the date of trial. There was no dispute concerning the extent of Elizabeth's injuries and the amount of her economic losses.

The standard of review of an order granting a motion for a new trial unless the plaintiff accepts a remittitur of the verdict is set forth in Harris v. Zee, 87 Nev. 309, 311-312, 486 P.2d 490, 491-492 (1971):

> When the trial judge orders a remittitur damnum and we are asked to review his action, the test is whether he abused his discretionary power. [Citation omitted.] This is an elusive standard. We must accord deference to the point of the view of the trial judge since he had the opportunity to weigh evidence and evaluate the credibility of witnesses—an opportunity foreclosed to this court. To this extent the appeal is weighted in favor of the order entered, and when there is a material conflict of evidence as to the extent of damage, a challenge to the trial court's exercise of discretion is substantially repelled. *However, this is not so when the evidence regarding damage is not in conflict. The order to remit immediately becomes suspect unless the amount awarded by the jury standing alone, is so excessive as to suggest the intrusion of passion and prejudice upon its deliberations.* (Emphasis added.)

We have long held that "[i]n actions for damages in which the law provides no legal rule of measurement it is the special province of the jury to determine the amount that ought to be allowed," so that a court "is not justified in reversing the case or granting a new trial on the ground that the verdict is excessive, unless it is so flagrantly improper as to indicate passion, prejudice or corruption in the jury." Forrester v. Southern Pacific Co., 36 Nev. 247, 295-296, 134 P. 753, 768 (1913), quoted in Southern Pacific Co. v. Watkins, 83 Nev. 471, 495, 435 P.2d 498, 513-514 (1967). Similarly in Brownfield v. Woolworth Co., 69 Nev. 294, 296, 248 P.2d 1078, 1079-1081, *reh. den.,* 69 Nev. 297, 251 P.2d 589 (1952), we noted that "[t]he elements of pain and suffering are wholly subjective. It can hardly be denied that, because of their very nature, a determination of their monetary compensation falls peculiarly within

the province of the jury. . . . We may not invade the province of the fact-finder by arbitrarily substituting a monetary judgment in a specific sum felt to be more suitable.''

In reversing a district court's order granting a new trial on the issue of damages, we recently noted that the mere fact that a verdict is large is not in itself '' 'conclusive that it is the result of passion or prejudice.' '' Beccard v. Nevada National Bank, 99 Nev. 63, 66 n. 3 657 P.2d 1154, 1156 n. 3 (1983), *quoting* Miller v. Schnitzer, 78 Nev. 301, 309, 371 P.2d 824, 828 (1962). Similarly, in Automatic Merchandisers, Inc. v. Ward, 98 Nev. 282, 646 P.2d 553 (1982), although we found the award "unusually high," we did not find it so "flagrantly improper" as to suggest jury passion, prejudice or corruption. In General Electric Co. v. Bush, 88 Nev. 360, 368, 498 P.2d 366, 371 (1972), this Court refused to set aside an award of $3,000,000 when the evidence of special damages went uncontroverted at trial. We refused to "substitute our opinion of damages for that of the jury," when the award, in view of the extent of personal injuries to the victim, did not "shock our judicial conscience."

Here, the evidence established that at the time of trial, the 22-year-old plaintiff was a permanent paraplegic, with a life expectancy of 57.2 years. Her legs are paralyzed; she cannot move without a wheelchair, she has no feelings below her waist; she has lost normal control over her bowel and sexual functions. In view of this permanent disabling injury suffered by plaintiff, the extent of which is not in conflict, an award of approximately $3,100,000 for pain and suffering is not so excessive as to suggest the intrusion of passion and prejudice upon the jury's deliberations. *See* General Electric Co. v. Bush, *supra;* Wry v. Dial, 503 P.2d 979 (Ariz.App. 1972). The jury's award of damages was proper. The district court's order of remittitur was error.

### THE DEALER

With regard to the appellant's claim of error in the district court's dismissal of the dealer, respondent Carson City Investors, we note that appellant has chosen to deal summarily with the issue, citing only secondary authority. Respondents have similarly failed to address the issue. In view of the strong suggestion that, under the circumstances of this case appellant is not actually aggrieved by the dismissal of the dealer so long as judgment will be available from the distributor, we decline to consider this claim of error. Smith v. Timm, 96 Nev. 197, 606 P.2d 530 (1980).

## CONCLUSION

The judgment notwithstanding the verdict is reversed. The jury verdict on the issues of liability and damages is reinstated. The court's orders denying an unconditional new trial and dismissing Carson City Investors are affirmed.[2]

MANOUKIAN, C. J., and SPRINGER, STEFFEN, and GUNDERSON, JJ., concur.

---

[2]In view of our opinion validating the jury's verdict as to both liability and damages, it is manifestly clear that Elizabeth shall not be subjected to a choice between acceptance of a remittitur or new trial as originally ordered by the district court.